## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                           **Case No. 8:19-cr-380-T-30CPT**

**DAVID ALLEN BOILEAU**
_____/

### SENTENCING MEMORANDUM
### AND REQUEST FOR A DOWNWARD DEPARTURE AND/OR
### DOWNWARD VARIANCE OR IN THE
### ALTERNATIVE A LOW-END SPLIT SENTENCE

COMES NOW, the Defendant, DAVID ALLEN BOILEAU, through undersigned counsel and pursuant to U.S.S.G. §§ 5H1.3, 5G1.3, App. N. 5, 5K2.23, and 18 U.S.C. § 3553(a), files this Sentencing Memorandum in support of a downward departure and/or variance below the low-end of his advisory guideline imprisonment range and to impose a time served sentence or a probationary sentence. In the alternative, this Court should impose a sentence no greater than the low-end of his advisory range, which would call for a 6-month time served sentence to be followed by a 1-year term of supervised release with the special condition he serve 6 months of home detention. As grounds in support, Mr. Boileau shows:

### FACTUAL AND PROCEDURAL HISTORY

Although he has entered a guilty plea to the misdemeanor offense of interfering with the housing rights of a homeowner because of the homeowner's

race, religion, and national origin, Mr. Boileau is not a racist. To the contrary, Mr. Boileau has been described by his friends and family as a person who, before his offense conduct, had never been "heard to utter a derogatory or prejudicial word about or towards anyone of another race or from another country," nor has he ever been a "harmful, racist person."[1]

Mr. Boileau's untreated mental health condition—not racism—caused Mr. Boileau's unlawful conduct of interfering with the housing rights of his neighbor, R.A., a Muslim woman, born in the Republic of Iraq. PSR ¶58. As explained by Mr. Boileau's family and friends, during the months leading to Mr. Boileau's unlawful conduct they had noticed a major change in Mr. Boileau's mental health and behavior.[2]

During an interview with law enforcement, David Moon, a longtime friend of Mr. Boileau advised:

> He had known Mr. Boileau for 25 years and had seen a change in him in the last year. Before [his offense conduct], he had never heard Mr. Boileau utter a derogatory or prejudicial word about or towards anyone of another country. He has drastically changed over the last year. He expressed concern that Mr. Boileau may be mentally ill.

*Id*.

Similarly, during an interview with law enforcement, Mr. Boileau's now ex-

---

[1] *See* Police Reports at **Attachment A**.
[2] *See* Police Reports at **Attachment A**.

wife advised:

> Mr. Boileau's father died approximately three years ago and Mr.
> Boileau had not recovered from his father's death. She conveyed her
> belief Mr. Boileau was suffering from a mental illness, possibly bipolar
> disorder. She believes he was suffering from bipolar because it runs in
> his immediate family and that his mother is in a home for her mental
> illness (bipolar), and his biological sister suffers from bipolar.

*Id.*

Finally, when Mr. Boileau's stepson was interviewed by law enforcement he

similarly advised:

> He has known Mr. Boileau for many years and he has never known
> him to be a harmful, racist person. He has noticed Mr. Boileau acting
> different over the last approximate two years. He said it started when
> Mr. Boileau's father passed away. He thinks Mr. Boileau is suffering
> from mental illness and needs help. He further advised that Mr. Boileau
> used to travel around the world working machines and there is no way
> he could have done his job and been a racist person. He spent time with
> so many different cultures and never had any problem in the past. He
> strongly believes [Mr. Boileau's offense conduct] is a mental health
> issue and he hopes Mr. Boileau can get the help he needs.

*Id.*

Following his federal arrest, Mr. Boileau was evaluated by forensic

psychologist, Dr. Scott D. Machlus, Ph.D, ABPP, who confirmed the fears of Mr.

Boileau's friends and family that Mr. Boileau's derogatory and offensive conduct

toward his Iraqi born Muslim neighbor was attributable to an untreated mental health

condition. PSR ¶58.[3] Specifically, Dr. Machlus diagnosed Mr. Boileau with bipolar

---

[3]*See also* Dr. Machlus, September 6, 2019, Forensic Psychological Evaluation

disorder with mood-congruent psychotic features characterized by agitation, grandiosity, impulsivity, decreased need for sleep, racing thoughts, pressured speech, disorganized thinking and speech, increased goal-directed behavior, involvement in activities with a high potential for negative consequences, and paranoia. *Id*. It was Dr. Machlus' professional opinion that Mr. Boileau's untreated bipolar disorder with mood-congruent psychotic features:

> [H]ad a direct impact on his thinking and behavior at the time of his offense. Specifically, that at the time of Mr. Boileau's offense conduct he was experiencing significant paranoia which lead him to believe that his neighbor was a terrorist and part of [the Islamic State of Iraq and Syria or "ISIS"]. As further explained by Dr. Machlus, his mental health induced grandiosity, increased goal directed behavior, and agitation, caused him to take it upon himself to safeguard the United States by spying on his neighbor and taking actions against his neighbor.

*Id.*

Dr. Machlus' opinion that Mr. Boileau's offense conduct was caused by his untreated mental health condition is corroborated by Mr. Boileau's post-*Miranda* statements and by his bizarre behavior at the time of his offense.

### A. Post-Miranda Statements

Mr. Boileau was interviewed by detectives with the Pasco County Sherriff's Office on January 22, 2019, and again by the FBI on February 7, 2019. During an initial January 22, 2019, interview, Mr. Boileau explained his offense conduct:

---

Report, which will be filed separately under seal.

He had been remodeling his house for approximately nine weeks when an unidentified man was walking by and started talking to him. He did not know the man's name but reported that he was a plumber. According to Mr. Boileau, the man looked and pointed to R.A.'s house, declaring: "ISIS lives there." After the conversation, Mr. Boileau took it upon himself to surveil R.A.'s house day and night because he was worried about ISIS being in the neighborhood. Mr. Boileau contacted the FBI to warn them about R.A.'s house, but he felt that he was being ignored by the FBI.

Mr. Boileau maintained a serious demeanor and reiterated that the victim was an ISIS terrorist. He also reported hearing screams coming from the victim's house and believed the screams were a woman's screams because ISIS beats their women. He further expressed concerns about R.A.'s curtains being open, taking it as a bad sign. He expressed that with the curtains opened R.A. and her family could see outside and thereby direct firearms to shoot him or police responding to the house to remove R.A.'s family.

He admitted to walking into a neighbor's backyard so that he could see into the back of R.A.'s house. He stated that when he did so, he noticed that the rear door was open and that the screen had a hole in it, which he also interpreted as troublesome because a rifle could be pointed through the screen. Mr. Boileau told the interviewing officer that he "needed to do something about it."

According to Mr. Boileau, he waited for everyone to leave R.A.'s house and then went back over to confirm that they were not home so that he could look inside the house to see if "anything was going on." He reported walking in all the rooms of R.A.'s house to make sure that the house was free from ISIS and so that he could take pictures for the FBI.

He admitted that he had received a shotgun from a neighbor and explained that he needed the shotgun for protection, and denied any intent to use it to go to R.A.'s house to harm anyone. He said he needed the shotgun in case somebody came into his house to hurt him. He added that he was aware how ISIS worked.[4]

---

[4] *See* Police Reports at **Attachment A**.

Mr. Boileau's February 7, 2019, FBI interview was substantially similar to the January 22, 2019, interview except to add that his interaction with the unknown man who advised him that ISIS lived in his neighborhood occurred on the night of the "blood wolf moon." *Id*. Additionally he added that the unknown man "told him he was dead and showed him where he killed himself." *Id*. During the second interview, Mr. Boileau advised the FBI, "he hears voices" in his own house because someone had died in his house. *Id*. Mr. Boileau, who became emotional during the interview, further advised that he called the FBI five times over a two-day period to report that ISIS was in his neighborhood before he took matters into his own hands. *Id*.[5]

### B. Bizarre Behavior by Mr. Boileau

Mr. Boileau's offense conduct is similar to that described in his post-*Miranda* interviews. According to the Presentence Investigation Report, after learning from an unknown man that his neighbor was ISIS and trying to involve the FBI without success, he took several actions, which intimidated and interfered with the peaceful

---

[5] According to the interviewing agent, much of what Mr. Boileau said was difficult to understand and he did not fully make sense. At one point Mr. Boileau spoke about different sequences of numbers and how he tries to figure out the meaning behind it. For example, he was trying to figure out what "3434" (his address) means. He believed all numbers have some tie to a person's life. Other numbers of interest to him were "2525" and "1515." *Id*.

and legal occupation of the home of R.A., a Muslim women from Iraq. PSR ¶8. Specifically, on January 21, 2019, Mr. Boileau tossed a handful of metal screws at or near a car parked on R.A.'s property, and when confronted by a neighbor about his actions, Mr. Boileau verbalized negative and derogatory comments about R.A. and Iraqis, including how they do not belong in the United States. PSR ¶9.

Then on January 22, 2019, the same neighbor observed Mr. Boileau walking down the street holding a bottle of what appeared to be alcohol, possibly wine, and that Mr. Boileau appeared to be inebriated. *Id*. Mr. Boileau was then observed peering into R.A's yard through her privacy fence and into her residence. *Id*. Mr. Boileau then entered R.A's back yard, knocked on and looked in the front window of R.A.'s house and yelled "hey" to see if anyone was home. *Id*. He then went to the back of the house, and entered R.A's residence through the unlocked back door, walked around the residence, looked into each of her rooms, and eventually exited through R.A.'s front door. *Id*. Then Mr. Boileau looked into R.A.'s open mailbox and observed mail from immigration authorities. *Id*.

Observing this behavior, Mr. Boileau's neighbor confronted Mr. Boileau and exclaimed, "Dude, you just broke into her house!" Mr. Boileau responded that he was not scared and directed his neighbor to call the police and the FBI, stating that R.A. was an ISIS terrorist. *Id*.[6]

---

[6] From January 21-January 22, 2019, Mr. Boileau's neighbors reported

Because of Mr. Boileau's bizarre and intimidating behavior toward R.A., the FBI interviewed several of Mr. Boileau's neighbors to assess the level or risk Mr. Boileau was to R.A. and her family's safety. When interviewed by the FBI, one of Mr. Boileau's neighbor described an incident when Mr. Boileau appeared uninvited to a family gathering.[7] While at the gathering, Mr. Boileau talked about a woman in the neighborhood who he believed to be a terrorist. *Id*. He admitted that he had broken into her home and observed evidence she was a terrorist. *Id*. When his neighbor told him he should not be doing that and he should leave it to the professionals, Mr. Boileau responded that the professionals were not doing their job. *Id*. He further stated that he would go on national television and out the neighbors as terrorists and put them on a watch list. *Id*.

Another neighbor advised that after breaking into R.A.'s home but before his arrest, Mr. Boileau told him he had gone in R.A.'s yard and peeked over the fence that separated his yard from R.A.'s yard. *Id*. He stated that he did not see enough so he went around R.A's property, looked through her mailbox, and entered her house

---

hearing Mr. Boileau make several derogatory statements to include: "The U.S. needs to rid the country of all of them"; "We will get rid of them one way or another"; "I will take care of that family"; and "there are dirty people that live in that house." Similarly, on March 18, 2019, Mr. Boileau was heard to exclaim in a loud voice in R.A.'s presence, "Get the fuck out of my country!" and "Get the fuck out of my neighborhood!" *Id*.

[7]*See* Police Reports at **Attachment A**.

through the back gate. *Id*. Mr. Boileau then stated the family is linked to ISIS and kept saying "ISIS" repeatedly. None of Mr. Boileau's neighbors ever heard Mr. Boileau make any statements he would harm R.A. and her family, and the neighbor who provided Mr. Boileau his shotgun advised that Mr. Boileau conveyed that he needed the shotgun to protect himself. *Id*.

Mr. Boileau's untreated mental health condition and his resulting paranoia-based bizarre behavior toward R.A. caused her to be concerned for her and her family's safety, interfering with her ability to live peacefully in her home. PSR ¶12. Mr. Boileau's offensive conduct toward R.A. and her family resulted directly from Mr. Boileau's untreated mental health condition that led to his belief that R.A. and her family were terrorists and members of ISIS. PSR ¶59.

Despite the significant role his untreated mental health condition played, his bizarre and offensive conduct toward R.A. and her family led to misdemeanor violations of both state and federal laws.

**State Court Procedural History**

On January 22, 2019, because of his uninvited entry into R.A.'s residence for Mr. Boileau's stated purpose of investigating to see if R.A. and her family were terrorists and members of ISIS, Mr. Boileau was arrested by state authorities and charged at first with unarmed burglary of an unoccupied dwelling. PSR ¶36. A

burglary under Florida law cannot occur unless the entry was to commit a crime.[8] Because Mr. Boileau's intent was not to commit a crime, but to investigate if R.A. was a terrorist, Mr. Boileau's felony burglary charge was reduced by the State of Florida to the more appropriate misdemeanor offense of trespass in an occupied structure or conveyance. *Id*.

On May 22, 2019, Mr. Boileau entered a guilty plea to this misdemeanor trespass offense and was sentenced to 90 days in jail. *Id*. Mr. Boileau completed his 90-day sentence on June 5, 2019. *Id*. Even so, Mr. Boileau was not released from custody, but taken into federal custody, because of the federal criminal complaint. Docs. 00-01.

### Federal Court Procedural History

At the time of his release from state custody, Mr. Boileau was arrested by federal authorities pursuant to a federal criminal complaint, alleging that Mr. Boileau had interfered with R.A.'s housing rights in violation of 42 U.S.C. §§ 3631(a) and (c). *Id*. As alleged, Mr. Boileau's offense conduct includes his unlawful entry into R.A.'s residence for which he had just completed a 90-day state sentence. Doc. 1. Mr. Boileau appeared in federal court on the criminal complaint on June 5, 2019, and was ordered detained. Docs. 05, 07.

On September 12, 2019, Mr. Boileau entered a guilty plea to a single count

---

[8] *See* Fla. Stat. § 810.02.

Information charging him with the misdemeanor offense of interfering with R.A.'s housing rights in violation of 42 U.S.C. §§ 3631(a) and (c). PSR ¶3. On September 30, 2019, this Court accepted Mr. Boileau's guilty plea, adjudicated him guilty, and set his sentencing hearing for December 19, 2019, at 9:15 a.m. *Id*.

## History and Characteristics of Mr. Boileau

Mr. Boileau was born on January 17, 1961, in Neenah, Wisconsin. PSR ¶46. He is 58 years old. *Id*. His father, a retired police officer, passed away on May 12, 2016, after sustaining a fatal head injury. *Id*. His mother, who worked as a food server, died on June 1, 2019, while Mr. Boileau was detained. *Id*. Mr. Boileau has been married twice; his second divorce occurred while he was detained here. PSR ¶¶49-50. He has no children. *Id*.

Mr. Boileau has worked continually since graduating from high school. PSR ¶¶66, 69-75. He has worked as a security guard (earning $7.50 per hour); as a maintenance worker in an assisted living facility (earning $12 per hour); as an electro-mechanical assembler (earning $21.84 per hour); as a maintenance and process engineer (earning $20 per hour); as a maintenance laborer for a beverage company (earning $20 per hour); and as a service representative and assembler for a packaging machine company (earning $20.10 per hour). PSR ¶¶ 69-75.

Mr. Boileau is a nonviolent person with no prior felony convictions. PSR ¶¶31-37. Besides his above-described mental health issues, Mr. Boileau has

struggled with alcohol abuse. PSR ¶¶61-65. That alcohol abuse has contributed to prior misdemeanor convictions for driving under the influence and criminal mischief. PSR ¶¶32, 34. The remainder of Mr. Boileau's criminal history involves his unlawful taking of a pair of handcuffs as a "memento" during his release from custody (petit theft), having an improper tag, and his failure to exit his home when an officer attempted to execute a misdemeanor violation of probation warrant (resisting without violence). PSR ¶¶33, 35, 37. Before his involvement with R.A., Mr. Boileau had never served a term of imprisonment. PSR ¶¶31-35. Because of his untreated mental health condition, which led to his conduct toward R.A., he has now served about 9 months in custody.

While Mr. Boileau is divorced and without children, he does have a supportive sister and ex-wife present for him both emotionally and financially and hope, as does Mr. Boileau, that as part of his sentence he can receive appropriate mental health and substance abuse treatment. PSR ¶60.

## GUIDELINE CALCULATIONS

Mr. Boileau's total offense level has been calculated by the United States Probation Office to be a level 11. PSR ¶29. Mr. Boileau has five criminal history points making him a criminal history category III offender resulting in an advisory range of 12 to 18 months. PSR ¶¶39, 78. Because Mr. Boileau has been convicted of a misdemeanor offense, the statutory maximum sentence he can receive is 12

months. PSR ¶77. Thus, the advisory guideline becomes the statutory mandatory penalty of 12 months. PSR ¶78.

Mr. Boileau's advisory range of 12 months falls within Zone C sentencing options, permitting a low-end sentence of 6 months in custody to be followed by a 1-year term of supervised release, which has as a special condition a six months term of home detention. U.S.S.G. § 5C1.1(d). Mr. Boileau has been in federal custody since June 5, 2019 (6 months, 14 days) and has been in combined state and federal custody for 9 months, 14 days.

## MOTION FOR DOWNWARD DEPARTURE TO ACCOUNT FOR MR. BOILEAU'S RELATED AND DISCHARGED 90-DAY STATE SENTENCE

On May 22, 2019, Mr. Boileau was sentenced to 90 days by a judge in Pasco County in Case No. 2019MM783 for trespassing in an occupied structure or conveyance related to his unlawful entry into R.A.'s residence. PSR ¶36. Mr. Boileau's trespass conviction is related and relevant conduct to his present offense of interfering with R.A.'s housing rights. Doc. 01. Mr. Boileau has completed serving this 90-day related sentence. PSR. ¶36.

If Mr. Boileau was still serving this 90-day sentence, U.S.S.G. § 5G1.3(b) would mandate this Court: (1) adjust the sentence for any period of imprisonment Mr. Boileau would have served on the 90-day sentence; and (2) the remaining portion of the 90-day sentence would have to be ordered to run concurrently with

any sentence imposed here. Since Mr. Boileau has completed his 90-day related case

sentence, U.S.S.G. § 5G1.3, App. N. 5 provides that:

> In the case of a discharged term of imprisonment, a downward departure is not prohibited if the defendant (A) has completed serving a term of imprisonment, and (B) subsection (b) would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense.

Similarly, U.S.S.G. § 5K2.23 provides:

> A downward departure maybe appropriate if the defendant (1) has completed serving a term of imprisonment; and (2) subsection (b) of § 5G1.3 (imposition of Sentence on a Defendant Subject to Undischarged Term of Imprisonment) would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense. Any such departure should be fashioned to achieve a reasonable punishment for the instant offense.

Here, because Mr. Boileau's related 90-day sentence is discharged, a

downward departure under § 5K2.23 and § 5G1.3, App. N. 5 would be appropriate.

Such a 90-day departure would create an advisory range of 9 months. At 9 months,

Mr. Boileau would fall within Zone B sentencing options making him eligible for a

low-end sentence of one year of supervised release with the special condition he

serve 9 months of home detention. U.S.S.G. § 5C1.1(c).

## REQUEST FOR A REASONABLE SENTENCE OF TIME SERVED TO BE FOLLOWED A TERM OF SUERPVISED RELEASE

Even if this Court were to depart from his advisory range of 12 months down

to 9 months under §§ 5K2.23 and 5G1.3, App. N. 5, this would require Mr. Boileau

to serve another 90 days in jail. Requiring Mr. Boileau to serve 90 more days in jail—thus the statutory maximum total penalty for his offense—would be unreasonable and greater than necessary to accomplish the purposes of sentencing. Given Mr. Boileau's history and characteristics a sentence greater than time served or at worst time served followed by a 1-year term of supervised release with the special condition he serve six months of home detention, given the significant role his mental health condition played in his nonviolent offense conduct, would constitute an unreasonable sentence.

Both the United States Sentencing Guidelines and the factors under 18 U.S.C. § 3553(a) support the imposition of a time served sentence follow by a term of supervised release that does not include a condition of home detention.

### A. U.S.S.G. §§ 5H1.3 (Mental Condition) and 5K2.13 (Diminished Capacity)

Mr. Boileau's mental health condition during the offense vests this Court with authority under the guidelines to depart downward and impose a time served sentence. Such a departure would be appropriate. At the time of his offense, Mr. Boileau was suffering from bipolar disorder with mood-congruent psychotic features, which affected his thinking and behavior. PSR ¶58. Specifically, because of his untreated paranoia, he believed his neighbor was a terrorist and his resulting behavior and conduct toward her was driven by his grandiosity and increased goal-directed behavior causing him to take it upon himself to safeguard the United States

15

from what he believed to be an ISIS terrorist threat. *Id.* U.S.S.G. § 5K2.13 provides:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement; the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.[9]

This departure provision has defined "significantly reduced mental capacity" to mean "the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13, App. N. In this case, the evidence, including, but not limited to, Dr. Machlus' expert opinion, establishes that Mr. Boileau was suffering from a significantly reduced mental capacity warranting a downward departure.

Additionally, U.S.S.G. § 5H1.3 appropriately recognizes that:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical case covered by the guidelines.

---

[9] Although not prohibitive in this case, § 5K2.13 further provides that "the court may not departure below the applicable guideline if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or intoxicants; (2) the facts and circumstances of the defendant's offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117 of title 18, United States Code.

Under §§ 5K2.13 and 5H1.3, a downward departure from 12 or 9 months to time served and the imposition of the statutory maximum 1-year term of supervised release during which Mr. Boileau will receive appropriate mental health and substance abuse treatment and community supervision would be appropriate.

### B. 18 U.S.C. § 3553 Grounds for Downward Variance

Besides Mr. Boileau's mental health and diminished capacity justifying a guideline downward departure, these offender characteristics would also warrant a downward variance under 18 U.S.C. § 3553(a). Given the nonviolent nature of Mr. Boileau; the nonviolent nature of his offense conduct; his lack of any significant prior criminal history; and because he has served over 9 months of the 12-month maximum statutory penalty; a sentence of time served followed by the statutory maximum of supervised release will be "sufficient but not greater than necessary" to accomplish the purposes of sentencing.

These 9 months mark the longest term of incarceration Mr. Boileau has ever served. During his incarceration, he has had significant time to reflect upon his offense conduct and his need for both mental health and substance abuse treatment so he can return to being the person his friends and family knew before the death of his father and the onset of his mental health issues. At 58, the likelihood of Mr. Boileau reoffending after receiving appropriate mental health and substance abuse treatment is generally low. Here, imposing an additional 90-day term of

incarceration will not be any more effective at deterrence, general or specific, than imposing a time served sentence with community supervision to follow.

Alternatively, a reasonable argument could be made that since the maximum term of supervised release allowable is 1 year, potentially the best way to protect the public would be to impose a term of probation, which by law can be for a term from one year up to five years. PSR ¶82, *citing* 18 U.S.C. § 3561(c)(2). Whereas, imposing any term of incarnation statutorily will only allow for one year of community supervision. PSR ¶80, *citing* 18 U.S.C. § 3583(b)(3).

Mr. Boileau regrets any harm he has caused R.A. and her family, and the pain, embarrassment, and suffering his actions has caused his own family. While Mr. Boileau believed he was protecting the U.S. from a true threat, he realizes now how hurtful his conduct was toward R.A. and the community. Given Mr. Boileau's atypical history, characteristics, and diminished capacity at the time of the offense, a time served or even a probationary sentence would appropriately address the "seriousness of his offense" and would "promote respect for the law." The 9 months Mr. Boileau has served, plus a term of court supervision, will be and has been a significant punishment. During this 9 months Mr. Boileau's mother passed away and his wife has divorced him. Certainly, 90 more days of imprisonment will have no greater specific or general deterrence effect nor will it provide any greater protection to the public than placing Mr. Boileau on community supervision.

This is true because, as part of his community supervision, Mr. Boileau will receive appropriate mental health and substance abuse treatment, and will be ordered to have no contact with R.A., her family, or her neighborhood. Such a sentence will create respect for the law in that it will show that the law has appropriately considered Mr. Boileau as an individual and appropriately considered his unique human failings and mental health issues, which mitigate his crime and his punishment.

**WHEREFORE**, the Defendant, DAVID ALLEN BOILEAU, respectfully moves this Honorable Court for a downward departure and/or variance below the low-end of his advisory guideline imprisonment range and to impose a time served sentence or a probationary sentence. In the alternative, this Court should impose a sentence no greater than the low-end of his advisory range, which would call for a 6-month time served sentence to be followed by a 1-year term of supervised release with the special condition he serve 6 months of home detention.

DATED this 9th day of December 2019.

Respectfully submitted,

DONNA LEE ELM
FEDERAL DEFENDER

*Adam B. Allen*
Adam B. Allen
Florida Bar No. 0998184
Assistant Federal Defender
400 North Tampa Street, Ste. 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Facsimile: (813) 228-2562
Email: Adam_Allen@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 9th day of December 2019, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Francis Murray

*Adam B. Allen*
Adam B. Allen
Assistant Federal Defender